[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case came to this court as a limited contested dissolution of marriage where the parties had agreed on custody but disagreed on visitation.
The parties were intermarried at Brattleboro, Vermont on November 4, 1972. The wife's maiden name was Pistey. There are two children of the marriage, one of whom is a minor. Mathew O'Leary was born March 28, 1973 and is over the age of 18. Nicholas O'Leary was born October 12, 1983.
The court finds that one of the parties for at least 12 months preceding the date of the filing of the complaint has been a resident of the State of Connecticut. Neither party or their children have been a recipient of state welfare assistance. The parties seek a dissolution of marriage and other claims.
At the time of the marriage neither of the parties brought any appreciable assets to the marriage. The wife, who had a two year associate degree, worked as a nurse, and the husband, who had a four year undergraduate degree and a Master's degree in psychology, was employed as a public school teacher. They first rented in Vermont and then, in 1974, purchased a home in Vermont. Mathew was born March 28, 1973, and the wife took off a brief period of time to have the child and then returned to her work.
In 1978 the husband sought to obtain a Master's in Business Administration. He left his teaching job and became a full time student at the University of Massachusetts for the next two years. In 1980 he received his Master's of Business Administration (hereinafter called MBA) and graduated at the top CT Page 3314 of his class. The wife continued her employment in nursing on a full time basis during this period serving as the primary source of income for the parties during this two year period of study.
After the husband's graduation from the University of Massachusetts with his MBA, he took a job with Merrill Lynch in New York City where he was involved in the human resources department. He was there until the middle of 1985. The parties moved to Brooklyn, New York at the time the husband began his job with Merrill Lynch. The husband moved up the corporate ladder at Merrill Lynch and, after four years, he was a vice president. In 1985 the husband was offered a job as Acting Director of Human Resources at First Boston Corporation. The husband eventually became the operator of First Boston's human resources program. He is a Managing Director of the company presently at the company's Park Avenue headquarters in Manhattan. He is also a secretary to the pension committee of the holding company.
When the parties moved to Brooklyn, the wife worked in Brooklyn as a nurse until the birth of the second child, Nicholas, on October 12, 1983. From Nicholas' birth through the parties' separation in 1988, she did not work. She has worked since the separation for Hospice in Connecticut for several months in 1990 and 1991. At Connecticut Hospice she earned $17.50 per hour on a part-time basis without benefits.
The parties sold their house in Brooklyn and acquired a home in Roseland, New Jersey. Proceeds for the purchase came from the equity in Brooklyn plus a home bank mortgage. In 1987 the parties sold their home in New Jersey making a profit of approximately 100,000.00 and moved to Westport, Connecticut. They purchased a home at 10 Clayton Road in Westport for approximately $473,000.00.
The husband commuted from Westport to Manhattan. The wife took a part-time job in a bookstore and began some studies at Fairfield University.
Problems arose in the marriage almost from the time the husband obtained his MBA. The wife claimed he was preoccupied with his work and did not attend to his family's needs other than the economic needs. While in Brooklyn, they saw a counselor. The husband, on the other hand, looks at the wife's problems with depression after the birth of Nicholas as part of the problems in the marriage. Suffice it to say, at this point this marriage has broken down irretrievably.
The husband presently lives in an apartment in New York City. The wife presently occupies the 10 Clayton Road CT Page 3315 property with the boys.
Since the separation, the support of the wife has been through the pendente lite orders entered by the court on May 16, 1991. These voluntary orders provided for an annual unallocated alimony and support of $125,000.00. In addition, the husband was to pay all uninsured medical expenses of Nicholas. Also, he was to carry life insurance coverage for the wife and Nicholas of $1,375,000.00. The husband was also ordered to pay $10,000.00 towards counsel fees and $3,125.00 for the wife's tuition.
The husband's financial picture was as follows:
YEAR BASE SALARY BONUS TOTAL CASH COMPENSATION
1988 $140,000.00 $360,000.00 $500,000.00
1989 $140,000.00 $260,000.00 $400,000.00
1990 $140,000.00 $175,000.00 $315,000.00
1991 $250,000.00 $225,000.00 $475,000.00
In addition, other benefits are received such as a medical and dental insurance plan, group life, accident and disability insurance benefits. He is fully vested in the company's profit sharing 401K plan to which the company as well as he make contributions. He is also fully funded in a company pension plan which, on the basis of his employment to December 31, 1990, will pay him on retirement $2,030.00 per month. These and other company benefits had for him in the year 1990 a value of $53,797.00 as shown on Exhibit 5.
Because the wife chooses not to be in the nursing career, she is seeking a career teaching literature or some other related field. She is presently involved in course work that will lead to a Bachelor's degree. She will, in the so-called "adult" program, take an additional three and a half years of school on a three semester full year basis. Following attainment of her degree, she expects to be able to teach at a salary level of approximately $35,000.00.
An examination of the husband's affidavit dated December 24, 1991, shows a total net monthly income of $15,186.45. On an annualized basis, that is $182,232.00. Note five of the husband's financial affidavit shows he will receive a bonus from his employer in February/March of 1992. The gross bonus will be approximately $225,000.00. There are deductions for the 401K plan and taxes computed which shows, by his CT Page 3316 affidavit, an additional $115,475.00 infused into the cash flow. This would be added to the $182,232.00 for a total net income of approximately $298,000.00. In addition, the husband has substantial life insurance as shown on his affidavit.
The marital domicile is valued on the husband's affidavit at $425,000.00. He has a BMW with an equity of about $4,000.00. He has an employee account at First Boston of $61,942.00. This fund was reduced approximately $86,500.00 by the husband withdrawing $50,000.00 to fund two custodial accounts, one for each of the children, on or about December 20, 1991, and he withdrew $36,500.00 on December 21st approximately to put the down payment on a co-op apartment.
The husband shows his First Boston nonvoting stock, which is vested, at approximately $38,000.00 on his financial affidavit as number 8 under assets. Another $88,000.00 approximately will vest in February of 1992, see Exhibit 8, and the remaining $177,000.00 will be vested within two years. Willful and continued misfeasance in the performance of his duties or voluntary termination can result in forfeiture however. Both of those appear to be within his control. The company may liquidate the husband's First Boston stock at any time. The company has, as a matter of policy, to date liquidated employee's stock holdings at the time of retirement or voluntary termination.
The financial affidavit of the husband shows the First Boston Risk Capital plans with an undetermined value.
The retirement plans, shown as number V. 10 on the husband's financial affidavit, show his IRA/401K plan having approximately $143,000.00 in value. It appears that the net value after taxes is approximately $100,000.00.
Number V. 11 on the husband's financial affidavit shows two deferred compensation plans with First Boston Corporation. The husband shows the value currently of the first deferred compensation plan to be $61,100.00 and the second deferred compensation plan to be a current value of approximately $53,1000.00. These plans will pay out at the time of the defendant's retirement approximately $38,000.00 a year for 15 years if he retires in ten years at age 55. If he retires at age 65, it will pay out over $100,000.00 for 15 years. Income tax will be payable at the time of receipt. This is a general obligation of the company and is not funded the way a qualified pension plan is. The defendant also has a pension plan with a present value, as of December 31, 1991, of $51,000.00 approximately. In addition, the husband has contracted to buy a co-op on which he has placed a $36,500.00 CT Page 3317 deposit.
The wife's financial picture other than showing household furnishings and automobiles is approximately $7,500.00 in bank accounts and an IRA of $7,131.00.
The court finds it has jurisdiction. The court has listened to the parties and listened to their witnesses and reviewed all of the exhibits in the case. In addition, the court has taken into consideration all the criteria set forth in Connecticut General Statutes 46b-81, assignment of property and transfer of title, 46b-82, the alimony statute, 46b-62, the attorney's fees statute, 46b-84, the child support statute, and all other relevant statutes, and in addition, the court has reviewed the financial affidavits of the parties and listened to the arguments of counsel and reviewed their claims for relief and briefs.
The parties have agreed upon joint legal custody with the physical custody of Nicholas being with the mother. That agreement reflects the present living arrangement and preserves the present environment, and this court will confirm that. The parties have also agreed on the order of visitation except as to the weekend visitation pattern. Presently that has the father visiting with Nicholas on two weekends in succession followed by a weekend in which Nicholas is with the mother followed by another two successive visitations by the father and so on. The mother has expressed concern that this arrangement is providing her with insufficient weekend time with her child and creating an inability to plan activities together during their free time. Her desire is a simple, alternating weekend arrangement that would give her more time with Nicholas. She has offered week time visitation for the father in the off week.
The court, having heard the parties and taken into consideration the criteria of 46b-56, orders as follows concerning custody and visitation:
CUSTODY AND VISITATION:
1. The husband and the wife shall retain joint, legal custody of the minor child, Nicholas O'Leary, and physical custody of said minor child shall be with the wife. The husband shall have the right of reasonable visitation which, unless otherwise agreed by the parties or ordered by a court of competent jurisdiction, shall be taken to mean visitation by the husband as follows:
 (a) Two successive weekends, from 10:30 a.m. Saturday through 7:30 p. m.
CT Page 3318
 (b) The following weekend shall be visitation with the mother.
(c) A repeat of (a).
(d) A repeat of (b) and so on.
 (e) Alternate holidays, except that when one party has the child Christmas Day, the other party shall have the child Christmas Eve.
 (f) Alternate school time vacations and one month during the summer recess.
 (g) Reasonable visitation on special occasions, such as birthdays of the parties, the child, and the like.
2. The parties shall consult with each other on major needs affecting the minor child such as major health care and educational questions. The wife shall make all day-to-day decisions concerning the minor child and, in the event of any disagreement with the husband, the wife's determination shall control subject to review by a court of competent jurisdiction in a proceeding initiated by the husband.
3. The husband shall pay for the support of the minor child the sum of $25,000.00 per year payable in 12 monthly payments of $2,084.00 each on the 15th day of each month commencing with the payment due May 15, 1992, all payments in advance.
4. The husband shall maintain his current medical and dental insurance for the minor child and shall keep him enrolled in his present medical reimbursement plan. If such coverage becomes unavailable, he shall provide reasonably equivalent medical and dental insurance for the minor child and keep him enrolled in any medical reimbursement plan that may become available through his employment.
5. The husband shall pay to the wife one half of any uninsured medical, including psychiatric, and dental, including orthodonture, expenses for the minor child. No such cost in excess of $150.00 per visit shall be incurred except in case of emergency without prior notice to and approval by the husband, which approval shall not be unreasonably withheld.
6. The husband shall maintain not less than $350,000.00 of unencumbered life insurance on his life for the benefit of CT Page 3319 the minor child Nicholas and shall furnish reasonable evidence of the same to the wife from time to time at her request.
7. The husband shall pay to the wife alimony in the sum of $100,000.00 per year payable in 12 equal installments of $8,333.33 each on the 15th day of each month in advance commencing May 15, 1992. Said alimony shall continue until the earliest of the following occurrences: (a) the death of the husband: (b) the death of the wife; (c) the remarriage of the wife or her cohabitation under the statutes.
 The court would consider the husband's retirement a material and substantial in circumstances.
 The alimony and child support as ordered by this court has taken into consideration the wife's claim for alimony of $102,000.00 and child support of $25,000.00 or an unallocated award of $141,000.00. The husband's proposal was $125,000.00 unallocated alimony with reduction to $100,000.00 in three years and then termination by October 2001.
8. The husband shall maintain not less than $750,000.00 of unencumbered life insurance on his life for the benefit of the wife so long as he is obligated to pay her alimony as provided herein. The husband shall furnish to the wife reasonable evidence of same from time to time at her request.
9. The husband shall maintain at his expense (under COBRA) medical and dental insurance coverage for the wife as the same may be available under his employer's group medical insurance plan for a period of three years following the date hereof.
10. The residence jointly owned by the parties at 10 Clayton Street, Westport, Connecticut is hereby transferred to the wife. The husband shall quitclaim his right, title and interest in and to the home in Westport, Connecticut, and the wife shall hold the husband harmless on the mortgage, real estate taxes and assessments. The husband's failure to transfer said premises shall cause a transfer by operation of law pursuant to 46b-81.
11. The husband shall transfer to the wife all household furniture and furnishings and all other tangible property now located in or about the residence of the parties at 10 Clayton Street, Westport, Connecticut, except for the items CT Page 3320 set forth on Schedule E attached hereto.
12. The husband shall be entitled to retain his 401K plan, which is taxable and is held by his employer, and the husband will make a cash payment to the wife as set forth below in lieu of her claims to this plan.
13. The husband will transfer one half of his interest in the First Boston Retirement Plan shown as item V. 12 on page seven of the husband's financial affidavit dated December 24, 1991. The total value shown is $51,030.00. She is to get one half of this.
14. The husband shall transfer to the wife one half of the amount of his two deferred compensation plans with First Boston as shown on page six V. 11 of the husband's financial affidavit of December 24, 1991, represented to be one half of $114,000.00 in the husband's claims for relief. This represents interest under the 1985 and 1986 deferred compensation plans. The husband shall make prompt, good faith efforts to assign to the wife her portion of such deferred compensation benefits and to obtain the consent of First Boston to such assignment. If formal assignment with the consent of First Boston is not possible, the wife shall be deemed the assignee of such deferred compensation benefits as between husband and the wife, and he shall pay over to the wife one half of all deferred compensation received by him at the time of receipt subject to the payment by her of all income taxes due with respect to her one half share.
15. In lieu of the wife's claims to the husband's vested and unvested shares of stock in his employer, CS First Boston, Inc., the husband will make the cash payments set forth below:
(a) within ninety days. $60,000.00;
(b) on or before April 1, 1993, $40,000.00;
(c) on or before April 1, 1994, $40,000.00;
 for total cash payments to the wife of $140,000.00. All such payments shall be property division and not periodic alimony, and accordingly, not deductible by the husband nor includable by the wife in her income.
16. The husband shall make a contribution towards the wife's attorney's fees within thirty days of the date of this decree in the sum of $10,000.00. CT Page 3321
17. The husband has testified that he opened certain accounts for the benefit of the children in December of 1991. He withdrew $50,000.00 and set up two $25,000.00 custodianship accounts for the children. The court, relying on the representations that these were custodial accounts, has made no orders concerning these, and they are deemed to be properties to be used for the benefit of the children. In addition, the husband has, on his financial affidavit of December 24, characterized the First Boston employee account shown on note four on page eight in the approximate sum of $17,000.00 as funds for the education of his sons. The court has taken that into consideration in making these orders.
18. The wife shall pay all of the debts shown by her as liabilities on her financial statement. The husband shall be solely responsible for all of the liabilities shown on his affidavit. Each of the parties is to hold the other harmless from any claims of those liabilities.
19. The wife shall have the choice of the automobiles which consist of a 1986 BMW and a 1985 Volvo. The husband shall have the other motor vehicle.
20. The husband shall keep, free and clear of any claim of the wife, all of his vested and unvested shares of his stock in his employer.
21. This court retains jurisdiction over this matter for the purpose of final approval of Qualified domestic Relation's order if any is needed.
22. The marriage of the parties is dissolved on the grounds of irretrievable breakdown.
23. All assets of the parties not addressed by this decision shall be the asset of the party free and clear of any claim of the other party.
KARAZIN, J.